UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHARTIS SPECIALTY INSURANCE COMPANY, | CASE NO. C11-335RAJ |
| Plaintiff, | ORDER |
| v. | |
| QUEEN ANNE HS, LLC, | |
| Defendant. | |

## I. INTRODUCTION

This matter comes before the court a motion for partial summary judgment (Dkt. # 44) from Plaintiff Chartis Specialty Insurance Company ("Chartis"), a motion for partial summary judgment (Dkt. # 50) from Defendant Queen Anne HS, LLC ("Queen Anne"), and Queen Anne's motion to amend its answer and counterclaims (Dkt. # 47). Only Queen Anne requested oral argument. The court finds oral argument unnecessary. For the reasons stated below, the court DENIES Chartis's motion for partial summary judgment, GRANTS in part and DENIES in part Queen Anne's motion for partial summary judgment, and GRANTS Queen Anne's motion to amend its answer and counterclaims. The court directs Queen Anne to file its amended answer and counterclaims no later than April 11, 2012. No later than April 20, 2012, the parties shall file a joint statement as described at the conclusion of this order.

Queen Anne converted the apartment complex that was once Seattle's Queen Anne High School into condominiums. The condominium owners (the "Association") were not pleased with Queen Anne's work; they sued Queen Anne in King County Superior Court in 2009 for, among other things, defective construction.

Queen Anne had two insurance policies. The first was a primary policy from Westchester Surplus Lines ("Westchester"). The second was an excess insurance policy from Chartis. The primary policy ensured that Westchester would pay no more than $1 million, regardless of whether Westchester paid $1 million in defense costs, indemnity, or a combination thereof. The Chartis policy provided up to $10 million in excess coverage.

Chartis knew about the King County litigation from its outset, although there is no evidence that Queen Anne initially demanded a defense from Chartis. There is no dispute that Westchester paid for Queen Anne's defense until August 1, 2011. At some point, Chartis and Queen Anne began to dispute whether Chartis had a duty to defend Queen Anne.

**A.      Chartis Disputes Its Duty to Defend.**

According to Chartis, it first articulated the policy interpretation that is now the centerpiece of this litigation in a telephone conversation with Queen Anne's risk manager in June 2010. Corona Decl. (Dkt. # 60) ¶¶ 5-6. Chartis asserted that its policy had a $1 million retained limit, and that although Queen Anne or Westchester could satisfy that limit with the payment of judgments or settlements, they could not satisfy it via the payment of defense costs. *Id.*

According to Chartis, that conversation led to another conversation with Queen Anne's Westchester-funded defense counsel. Corona Decl. (Dkt. # 60) ¶ 7. Shortly thereafter, Queen Anne's insurance coverage counsel contacted Chartis to discuss the issue. *Id.* ¶ 8. Coverage counsel's first written communication with Chartis (so far as the record reveals) was a November 30, 2010 letter in which he proposed having Westchester

1  tender the remainder of its policy limit to Chartis, and Chartis thereafter assuming Queen

2  Anne's defense in the King County litigation.  *Id.*, Ex. B.  Chartis responded in a

3  February 8, 2011 letter that reiterated its interpretation of its policy.  *Id.*, Ex. C.  The

4  letter explained that Chartis had no evidence that the $1 million retained limit had been

5  paid in accordance with the policy, and it therefore had no duty to defend.

6       Queen Anne's risk manager contends that Chartis did not communicate its

7  coverage position until the February 8, 2011 letter.  Wright Decl. (Dkt. # 54) ¶ 4.  He

8  does not, however, squarely address Chartis's account of its June 2010 conversation with

9  him.

10       After Queen Anne's coverage counsel again disputed Chartis's interpretation of

11  the policy, Chartis filed this lawsuit in late February 2011.  It sought a declaratory

12  judgment as to its coverage and defense obligations.  At the time, all parties were aware

13  that the Westchester Policy would soon exhaust, mostly via the payment of Queen

14  Anne's defense costs.  Soon after filing this lawsuit, Chartis appointed counsel to

15  "associate" with Queen Anne's Westchester-funded defense counsel in the King County

16  litigation.

17       In a July 27, 2011 order (Dkt. # 31), this court ruled that Chartis had correctly

18  interpreted its policy in one aspect: the policy did not obligate Chartis to defend merely

19  because Queen Anne would soon exhaust the Westchester policy via the payment of

20  defense costs.  Instead, Chartis's defense obligation would accrue only once Queen Anne

21  (or someone on Queen Anne's behalf) paid $1 million in judgments or settlements.  In

22  that order, the court dissected the Chartis policy, including an explanation that much of

23  the relevant portion of the policy had been amended via "Endorsement No. 20."  As the

24  court will soon discuss, Endorsement No. 20 is critical to the dispute the parties now

25  raise.

26       This court's order coincided with the exhaustion of the Westchester policy.  Queen

27  Anne's Westchester-funded defense counsel withdrew from the King County litigation on

1  August 1, 2011.  At the time, the King County trial was set for October 24, 2011.  Queen

2  Anne reiterated its demand that Chartis assume its defense, to no avail.  Chartis's

3  associate counsel remained counsel of record in the King County litigation, but there are

4  many factual disputes over whether he actually intended to defend Chartis at trial,

5  whether he acted on Queen Anne's behalf or Chartis's, and whether Queen Anne could

6  rely on him to provide a vigorous defense through trial.

7  **B.      Queen Anne and the Association Craft a Partial Settlement to Trigger
          Chartis's Duty to Defend.**

8

9  Although the payment of $1 million in defense costs could not trigger Chartis's

10  duty to defend, Queen Anne believed that the payment of $1 million of its liability to the

11  Association would suffice.  Queen Anne and the Association hatched a plan.  The

12  Association would settle some, but not all, of the claims in the King County litigation in

13  exchange for a promissory note for $1 million.  As security for the note, Queen Anne

14  would pledge an asset it believed this court's July 2011 order helped create: a cause of

15  action against its insurance broker for malpractice in procuring Queen Anne's insurance

16  portfolio.

17  Queen Anne made no secret of the partial settlement plan; it informed Chartis as

18  early as August 1, 2011.  Wright Decl. (Dkt. # 54), Ex. 8.  Chartis rejected the plan,

19  contending among other things that providing a promissory note did not satisfy its policy.

20  Wright Decl. (Dkt. # 54), Ex. 7 (Aug. 3, 2011).  It is that contention that is the focus of

21  the motions now before this court.

22  On August 24, 2011, the Association and Queen Anne perfected their partial

23  settlement.  Laveson Decl. (Dkt. # 45), Ex. C.  The Association agreed to dismiss certain

24  claims that the parties agreed were worth more than $1 million.  *Id.*  In exchange, Queen

25  Anne executed a promissory note in the Association's favor.  The note had a principal

26  balance of $1 million, and was payable in full (with interest accruing at 6.25% per year)

27  in November 2012.  *Id.*  Queen Anne pledged its cause of action against its insurance

1  broker as collateral for the promissory note, memorializing its pledge in a security

2  agreement with the Association. *Id.*

3       Having executed the partial settlement and its accoutrements, Queen Anne again

4  demanded a defense from Chartis. Wright Decl. (Dkt. # 54), Ex. 9 (Aug. 26, 2011).

5  Chartis again declined, relying on its prior arguments. *Id.*, Ex. 10 (Sept. 7, 2011). Even

6  before Chartis made its last refusal to defend Queen Anne, the Association made an offer

7  to settle all remaining claims in the King County litigation for $9 million. Wright Decl.

8  (Dkt. # 54), Ex. 11 (Sept. 1 settlement demand). Chartis declined to fund the settlement.

9  **C.    Queen Anne and the Association Reach a Final Settlement.**

10       Not long after reaching the partial settlement, Queen Anne and the Association

11  reached a conditional final settlement for just over $12 million. The principal condition

12  was the approval of the settlement at a reasonableness hearing before the Honorable Beth

13  M. Andrus, the judge presiding over the King County litigation. That hearing took place

14  on September 30, 2011. Judge Andrus declined to find the settlement reasonable, but

15  agreed that a settlement for $10.4 million would be reasonable.

16       The Association chose to accept the settlement amount that Judge Andrus had

17  deemed reasonable. On October 3, 2011, the Association and Queen Anne executed a

18  settlement agreement. Queen Anne agreed to the entry of a $10.4 million judgment ($1

19  million of which it had already satisfied with the note it executed in the partial settlement

20  agreement). The Association agreed not to execute the judgment against Queen Anne or

21  its members, but reserved all rights it had won in the partial settlement agreement. Queen

22  Anne assigned its claims against Westchester and Chartis to the Association. The

23  Association's counsel in the King County litigation now represents Queen Anne in this

24  case.

25       Three motions are now before the court. In the first, Chartis seeks partial

26  summary judgment that Queen Anne's $1 million promissory note is not a payment of

27  judgments or settlements sufficient to trigger its duty to defend. Queen Anne's partial

1  summary judgment motion seeks the opposite ruling, along with a ruling that Chartis

2  acted in bad faith as a matter of law.  Queen Anne also moves to amend its answer and

3  counterclaims to assert claims against Chartis for breach of its policy, for bad faith, and

4  for a violation of Washington's Consumer Protection Act.

5  **III. ANALYSIS**

6  On a motion for summary judgment, the court must draw all inferences from the

7  admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred*

8  *Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate

9  where there is no genuine issue of material fact and the moving party is entitled to a

10 judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show

11 the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

12 323 (1986).  The opposing party must then show a genuine issue of fact for trial.

13 *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

14 opposing party must present probative evidence to support its claim or defense.  *Intel*

15 *Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The

16 court defers to neither party in resolving purely legal questions.  *See Bendixen v.*

17 *Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

18 **A.      Chartis Breached Its Duty to Defend When it Did Not Take Up Queen Anne's**
            **Defense After the August 24, 2011 Partial Settlement.**
19
   In Washington, insurance policy interpretation is a legal question.  *Overton v.*
20
   *Consol. Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002) ("Interpretation of insurance policies is
21
   a question of law, in which the policy is construed as a whole and each clause is given
22
   force and effect.").  The court must give the terms of the policy a "fair, reasonable, and
23
   sensible construction as would be given to the contract by the average person purchasing
24
   insurance."  *Id*. (internal quotation omitted).  Terms defined within a policy are to be
25
   construed as defined, while undefined terms are given their "ordinary and common
26
   meaning, not their technical, legal meaning."  *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244,
27

1246 (Wash. 1997). Dictionaries may assist in determining the ordinary meaning of a
term. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990). If policy
language on its face is fairly susceptible to two different but reasonable interpretations,
ambiguity exists. *Peasley*, 932 P.2d at 1246 (cited in *Petersen-Gonzales v. Garcia*, 86
P.3d 210 (Wash. Ct. App. 2004)); *Allstate Ins. Co. v. Hammonds*, 865 P.2d 560, 562
(Wash. Ct. App. 1994) (ambiguity exists "when, reading the contract as a whole, two
reasonable and fair interpretations are possible."). Extrinsic evidence may provide the
meaning of an ambiguous term, but only where that evidence shows that both parties to
the policy intended a particular meaning. *Am. Nat'l Fire Ins. Co. v. B&L Trucking &
Const. Co.*, 951 P.2d 250, 256 (Wash. 1998); *see also Quadrant Corp. v. Am. States Ins.
Co.*, 110 P.3d 733, 737 (Wash. 2005) ("If a clause is ambiguous, [a court] may rely on
extrinsic evidence of the intent of the parties to resolve the ambiguity."). Because parties
rarely negotiate the terms of an insurance policy, there is rarely evidence of the parties'
mutual intent as to the meaning of a policy term. Where extrinsic evidence does not
resolve an ambiguity, the court must construe the ambiguous term in favor of the insured.
*Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 141 (Wash. 2000); *see
also Hammonds*, 865 P.2d at 562 (directing courts to resolve ambiguity against insurer
"even where the insurer may have intended another meaning").

In Washington, a court looks to policy language to determine when an excess
insurer has a duty to defend. *Weyerhaeuser*, 15 P.3d at 135. The court thus turns to
Chartis's policy. As the court has briefly explained, its prior order explains much of the
preliminary interpretation necessary to determine the policy's trigger for Chartis's duty to
defend. Rather than repeat that analysis, the court reiterates that the policy terms that are
critical to this dispute are in Endorsement No. 20.

The clause in Endorsement No. 20 that obligates Chartis to defend Queen Anne in
certain circumstances is as follows:

### III.   DEFENSE PROVISIONS

        A.      We will have the right and duty to defend any **Suit** against the **Insured** that seeks damages for **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** covered by this policy, even if the **Suit** is groundless, false, or fraudulent when the applicable limits listed in the Schedule of Retained Limits have been exhausted by payment of **Loss** to which this policy applies.

End. No. 20, p. 1-2 of 5.  Endorsement 20 also includes a definition of "**Loss**":

        P.      **Loss** means those sums actually paid as judgments or settlements, provided, however, that if the applicable **Retained Limit** is specifically designated in the Schedule of Retained Limits as including **Defense Expenses**, then **Loss** shall include such **Defense Expenses**.

End. No. 20, p. 3 of 5.  The court's prior order establishes that the applicable retained limit is $1 million, and that this limit is not designated as including defense expenses. Thus the Chartis policy obligates Queen Anne (or someone else on its behalf)[1] to show that it "actually paid" a judgment or settlement of at least $1 million.

    **1.**      **Queen Anne "Actually Paid" a $1 Million Settlement with Its Promissory Note.**

The question the court must answer is whether Queen Anne's execution of a $1 million promissory note in the partial settlement is "actual payment"[2] of a settlement.  In deciding what "actual payment" means, the court begins with the phrase's "ordinary and common meaning" as opposed to its "technical, legal meaning."  *Peasley*, 932 P.2d at 1246.  When people speak of paying for something, they sometimes mean giving cash equal to the price of the good or service for which they are paying.  But sometimes, they mean providing a promise that they (or someone else) will give cash equal to the asking price.  For example, it is common to "pay by check," even though a check is not cash or

---

[1] Some policies dictate *who* must pay the retained limit that triggers the excess insurer's responsibilities.  *E.g.*, *Ins. Co. of Pa. v. Acceptance Ins. Co.*, No. SACV 01-225 DOC (ANx), 2002 U.S. Dist. LEXIS 27832, *19-20 (C.D. Cal. Apr. 29, 2002).   The Chartis policy does not.

[2] Where grammar demands, the court uses phrases like "actual payment" or "actually pay" as the equivalent of the term "actually paid" in the Chartis policy.

1  currency, but rather a promise that the payor's bank will transfer cash or currency to the

2  payee, a promise for which the payor is liable if the bank does not or cannot make the

3  transfer.  One might say, for example, that she "paid by check," but the check bounced,

4  so she had to "pay" again.  Chartis would argue, it seems, that when someone "pays by

5  check," she does not "actually pay," but rather promises to pay.  Chartis has a point, but it

6  is a point that only a lawyer or banker would make.  In common parlance, a check is

7  "actual payment."  Similarly, when one is asked how she "paid for her house," she might

8  respond "I put $10,000 down and took out a mortgage for the rest."  Again, the only cash

9  with which she parted was her down payment; her mortgage issuer paid the remainder,

10 subject to her secured promise to repay a promissory note.  In common usage, "actual

11 payment" can mean payment in cash or payment by a promise to pay.  The Chartis policy

12 is at best ambiguous as to whether Queen Anne's promissory note was "actual payment."

13      As Chartis acknowledges, "payment" can mean an exchange of something other

14 than money.  Chartis admits that it would have no quarrel if Queen Anne had paid the $1

15 million partial settlement with lakefront property or gold bars.  In Chartis's view (a view

16 that comports with ordinary language) exchanging something of like value for a desired

17 good is "paying" for the good.  What Chartis does not answer, however, is why the

18 Association was free to accept payment in the form of gold bars or real property, but was

19 not free to accept payment in the form of a secured promissory note.[3]

20 _____

21      [3] The "technical, legal meaning" of an insurance policy term is not relevant. *Peasley*, 932
22 P.2d at 1246; *see also Kitsap County v. Allstate Ins. Co.*, 964 P.2d 1173, 1178 (Wash. 1998)
   ("[T]he ordinary meaning will prevail unless it is clear that both parties intended the legal,
23 technical meaning to apply.").  Nonetheless, Chartis points to Washington's enactment of the
   Uniform Commercial Code, which provides that a note merely suspends an obligation until the
24 note is paid.  RCW § 62A.3-310(b)(2).  That statute, however, also permits parties to agree that a
   note extinguishes the underlying obligation for which it is executed.  Washington courts have
25 long held that a note is presumptively not payment, but that parties are free to agree otherwise.
   *Cook v. Vennigerholz*, 269 P.2d 824, 826 (Wash. 1954) ("The rule is clear that the giving of a
26 note is not payment of a pre-existing obligation, in the absence of an agreement to that effect.").
   The settlement agreement between the Association and Queen Anne makes clear that execution
27 of the note extinguished Queen Anne's settlement obligations.

1    Standard English dictionaries confirm that the ordinary meaning of "pay"
2  encompasses payment by promissory note.  To "pay" means "to satisfy (someone) for
3  services rendered or property delivered," to "discharge an obligation to," "to give in
4  return for goods or service," or "to discharge indebtedness for."  *Webster's 3d New Int'l*
5  *Dictionary* 1659 (2002).  None of these definitions prohibits payment with a promissory
6  note.  To "pay" can also mean "to engage for money," *id.*, but the plethora of broader
7  meanings demonstrates that the exchange of money or property is not necessary for
8  payment.  The requirement of "actual" payment does not make a material difference.
9  That which is "actual" is "EXISTENT – contrasted with *potential* and *possible*," or
10  "existing in fact or reality" or "really acted or carried out – contrasted with *ideal* and
11  *hypothetical*."  *Id.* at 22.  Under these definitions, a promissory note is as "actual" a form
12  of payment as cash or property.  The only definition that arguably supports Chartis's
13  view is an alternate definition "something actually received or at hand (as a cash receipt
14  or a market commodity) as distinct from estimated or expected."  *Id.*  Putting aside the
15  financial-market context of that definition, a promissory note "actually received" is
16  arguably "actual" even under the alternate definition.
17    As a final comment on the ordinary meaning of "actual payment," the court
18  observes that Chartis would have had no apparent objection if Queen Anne had gone to a
19  bank, taken out a $1 million loan, and paid its partial settlement obligations with the
20  proceeds.  Instead, Queen Anne borrowed the money from the Association itself.  The
21  Association could have transferred $1 million to Queen Anne in exchange for the
22  promissory note, then had Queen Anne use the money to pay off the partial settlement.
23  In that transaction, Queen Anne would have "paid" a settlement.  The court sees no
24  reason to treat the partial settlement as something other than a "payment" merely because
25  the parties did not engage in the unnecessary formality of transferring money.
26    Worse for Chartis is that the Washington Supreme Court has twice decided that
27  the term "payment," in an insurance policy clause triggering an insurer's obligations to its

1  insured, encompasses payment by promissory note.  In the first case, the court considered

2  an insurance policy with the following clause:

3       No action shall lie against the company as respects any loss under this
         policy unless it shall be brought by the assured himself to reimburse him
4        for loss actually sustained and paid by him in satisfaction of a judgment
         after trial of the issue.

5  *Seattle & San Francisco Railway & Navigation Co. ("Seattle Railway") v. Md. Cas. Co.*,

6  96 P. 509, 510 (Wash. 1908).  After entry of a $25,000 judgment against it, the insured

7  executed a promissory note for $25,000 plus accrued interest to the judgment's assignee.

8  *Id.* at 509.  It then turned to its insurer for indemnity.  The insurer claimed that merely

9  executing the note did not satisfy its policy language.  The court rejected the argument:

10      The execution of a note in exchange for satisfaction [of a judgment] is in
        legal effect equivalent to the exchange of property therefor.  It confers a
11      right to invoke legal process to seize and levy upon property in value equal
        to the amount of the note.

12

13  *Id.* at 510.  The court concluded that by executing the note, the insured "accomplished

14  satisfaction and payment of a valid judgment."  *Id.*  The court reached the same

15  conclusion in *Taxicab Motor Co. v. Pac. Coast Cas. Co.*, 132 P. 393, 395 (Wash. 1913),

16  finding a promissory note to constitute "payment" in accordance with a policy term

17  essentially identical to the one in *Seattle Railway*.

18       Chartis asks the court to overlook *Seattle Railway* and *Taxicab*, contending that

19  they are the antique byproducts of judicial hostility to the indemnity-only insurance

20  policies of a bygone era.  Chartis may well be right in its historical assessment, but its

21  legal assessment misses the mark.  The *Seattle Railway* and *Taxicab* courts did not reach

22  their conclusions by invoking public policy or decrying the harshness of the policies, they

23  reached their results by construing the meaning of "paid" in the policies themselves.  The

24  courts concluded that satisfying a judgment by execution of a promissory note is

25  "payment."  The court cannot discount precedent merely because of suppositions about

26  the agenda underlying it.  That the two cases are a century old is also an insufficient basis

27  to distinguish them.  Legal precedent does not come with an expiration date; it endures

1  until a court with the authority to do so abrogates it.  Chartis does not suggest that any

2  Washington court has limited either *Seattle Railway* or *Taxicab*, and this court is not

3  empowered to do so.

4          Although Chartis has no Washington authority to undermine *Seattle Railway* or

5  *Taxicab*, it relies on a host of precedent from other jurisdictions.  The cases Chartis cites

6  are appealing in the sense that they address excess insurance and the acts that trigger the

7  obligations of excess insurers.  Beyond that, however, they provide little support for

8  Chartis's position.  Most of them stand for the proposition that an insured cannot trigger a

9  properly-worded excess insurance policy by settling with its primary carrier for less than

10  the full limit of the primary policy.  *E.g.*, *Qualcomm, Inc. v. Certain Underwriters at

11  Lloyd's*, 73 Cal. Rptr. 3d 770, 778-82 (Cal. Ct. App. 2008); *Comerica Inc. v. Zurich Am.

12  Ins. Co.*, 498 F. Supp. 2d 1019, 1032 (E.D. Mich. 2007).  One Washington court has

13  reached the same conclusion, albeit in an analysis that did not mention the language of

14  the excess insurance policy.  *Rees v. Viking Ins. Co.*, 892 P.2d 1128, 1130 (Wash. Ct.

15  App. 1995).  In another case on which Chartis relies, a federal court held that where an

16  excess policy required "payment of judgments or settlements," the mere entry of

17  judgment against the insured was insufficient to trigger a duty to defend.  *Estate of

18  Bradley v. Royal Surplus Lines Ins. Co.*, 647 F.3d 524, 530-31 (5th Cir. 2011).  Chartis

19  also likens the retained limit of its policy to a self-insured retention, and relies on

20  authority establishing that an insurer may use its policy terms to dictate not only how to

21  satisfy a self-insured retention, but *who* must satisfy it.  *Ins. Co. of Pa. v. Acceptance Ins.

22  Co. ("Acceptance")*, No. SACV 01-225 DOC (ANx), 2002 U.S. Dist. LEXIS 27832

23  (C.D. Cal. Apr. 29, 2002).  In *Acceptance*, the court held that a policy term making "[the

24  insured] . . . responsible for the full Self-Insured Retention before the limits of insurance

25  under th[e] [excess] policy apply," regardless of other insurance, required the insured to

26  pay the self-insured retention *itself*.  *Id.* at *19-20.

27

1    None of the cases on which Chartis relies answer the question now before the

2    court: whether an insured "actually pays" a settlement when it executes a promissory note

3    for the settlement amount.  At best, they stand for the proposition that the language of the

4    excess policy controls.  For example, whereas Chartis points out that many excess

5    insurers word their policies such that a below-limits settlement with a primary insurer

6    will not trigger its obligations, some policies fail to do so.  *See Trinity Homes LLC v.*

7    *Ohio Cas. Ins. Co.*, 629 F.3d 653, 658 (7th Cir. 2010) (finding ambiguity in excess policy

8    requiring the limits of underlying insurance to be "exhausted by payment of claims").

9    Similarly, an excess insurer cannot mandate that a primary insurer pay a loss where the

10   policy language merely requires that the primary insurer be "obligated to pay" the loss.

11   *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 706-707 (Mo. 2011) (distinguishing,

12   at n.6, *Comerica* and other cases on which Chartis relies).

13        The lesson that Chartis's precedent teaches is no different than the command of

14   Washington law.  The court must rely solely on the language of the policy.  In this case,

15   the Chartis policy mandates actual payment, but it does not specify *how* actual payment is

16   to be accomplished.  Some insurance policies do.  *See*, *e.g.*, *Citigroup Inc. v. Fed. Ins.*

17   *Co.*, 649 F.3d 367, 372 (5th Cir. 2011) ("The [excess] policy not only requires payment,

18   but also specifies that the 'total' limit of liability . . . be paid 'in legal currency.'"); *Great*

19   *Am. Ins. Co. v. Bally Total Fitness Holding Corp.*, No. 06 C 4554, 2010 U.S. Dist.

20   LEXIS 61533 (N.D. Ill. 2010) (requiring primary insurer to "have paid, in the applicable

21   legal currency, the full amount of the Underlying Limit").  If Chartis wished to preclude

22   payment by promissory note, it was obligated to do so expressly.  It merely required

23   "actual payment," a term whose ordinary meaning encompasses payment by note.

24        **2.    Chartis's Breached Its Duty to Defend By Relying on Its Interpretation
             of "Actually Paid."**
25

26        Because Queen Anne's partial settlement was at least a plausible "actual payment"

27   of $1 million, Queen Anne had a duty to defend no later than August 24, 2011.  The court

1  reaches that conclusion despite Chartis's several alternative defenses beyond its

2  interpretation of "actual payment."  For example, Chartis argues that it satisfied its duty

3  to defend by making associate counsel available to Queen Anne.  It argues that the partial

4  settlement was a sham, and could not qualify as "actual payment" even if a promissory

5  note is an acceptable form of "actual payment."  It argues that the partial settlement may

6  not have covered a "loss" within the meaning of the policy, and that it may have covered

7  more than one "occurrence" within the meaning of the policy, thus obligating Queen

8  Anne to satisfy more than one $1 million retained limit.  Although the court will soon

9  address these arguments, none of them was a sufficient reason to deny a defense on

10  August 24, 2011, a conclusion that the court now explains.

11      A court assesses an excess insurer's duty to defend somewhat differently than it

12  assesses the duty of a primary insurer.  A primary insurer's duty arises when its policy

13  "conceivably covers" the allegations of a complaint against its insured.  *Woo v.*

14  *Fireman's Fund Ins. Co.*, 164 P.3d 454, 459 (Wash. 2007).  As the court has noted, the

15  document that governs an excess insurer's duty is the excess policy itself.  *Weyerhaeuser*,

16  15 P.3d at 135.  But excess insurance provides no greater license to deny a defense to an

17  insured.  An excess insurer must defend if an insured engages in conduct that conceivably

18  triggers the defense obligation described in the excess policy.  In this case, even if the

19  partial settlement was a sham, even if it did not extinguish a covered loss, even if it did

20  not extinguish claims arising from a single occurrence, it at least conceivably exhausted

21  the retained limit.  Chartis was obligated to assume Queen Anne's defense.  Its alternative

22  justifications may have provided fodder for this declaratory judgment action, but they did

23  not provide a reason to deny Queen Anne a defense after August 24, 2011.  *See Woo*, 164

24  P.3d at 460 (noting that insurer can "defend [its insured] under a reservation of rights and

25  seek a declaratory judgment that it has no duty to defend").

26      Chartis did not satisfy its defense obligation by providing "associate counsel" to

27  Queen Anne.  The duty to defend requires an insurer to pay for an attorney who has the

insured as her client.  When Chartis provided associate counsel, it made clear that it did not do so to satisfy its duty to defend (even under a reservation of rights).  Instead, it provided associate counsel under a policy clause that gave it "the right, but not the duty, to participate in the defense of any Suit . . . to which this policy may apply."  Corona Decl. (Dkt. # 60), Ex. E.  In other words, Chartis announced from the outset of its agreement to provide associate counsel that it was not providing defense counsel, it was providing counsel who would merely "participate" in Queen Anne's defense.  It did not change that arrangement after Queen Anne "actually paid" the partial settlement on August 24, 2011.

**3.      For Summary Judgment Purposes, Chartis Has Not Established Any of Its Alternate Justifications for Refusing to Defend Queen Anne.**

Chartis has not satisfied either its legal or evidentiary obligations to win a summary judgment that it has prevailed on any of its alternate justifications for refusing to defend Chartis.  As to its contention that Queen Anne's partial settlement with the Association was a sham, it lacks both the legal foundation and the evidence to prevail on summary judgment.  If there is a "sham" exception to Chartis's requirement of "actual payment," it is a narrow one.  Chartis complains that the settlement was the product of collusion for the purpose of triggering its duty to defend.  There is no question that Queen Anne and the Association colluded for this purpose; Queen Anne told Chartis as much from the conception of the partial settlement.  The partial settlement expressly announced the parties' collusion.  But there is nothing presumptively improper about collusion for the purpose of obtaining insurance coverage.  If the Chartis policy had required Queen Anne to exhaust the retained limit by executing a promissory note on the third Thursday of the month, it could hardly complain if the Association and Queen Anne colluded to make sure that Queen Anne complied.  On the surface of the settlement agreement, Queen Anne did nothing more nefarious in this case.  It openly agreed with the Association to effect payment in a way that would trigger the Chartis policy.

ORDER- 15

1    If the claims that the Association extinguished in the partial settlement were not

2    reasonably susceptible of a valuation of at least a million dollars, Chartis could perhaps

3    claim that the settlement was a sham. Similarly, if the consideration Queen Anne offered

4    (a million-dollar note secured by its claims against its insurance broker) was not

5    reasonably susceptible of a valuation of at least a million dollars, Chartis could also

6    arguably cry foul. And alternatively, if the Association and Queen Anne reached a secret

7    agreement that Queen Anne would never attempt to collect on the note, the partial

8    settlement might be a sham. *See Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 121-

9    123 (5th Cir. 1987) (concluding, under Texas law, that an insolvent insured made no

10   valid payment when it executed a promissory note subject to the agreement that it would

11   never be collected). The court makes no ruling regarding the sort of sham transaction

12   that might not qualify as "actual payment" under the Chartis policy. The parties have not

13   sufficiently briefed that issue. The court merely acknowledges that some transactions

14   purporting to be "payments" might not trigger a policy like Chartis's. *Cf. Seattle*

15   *Railway*, 96 P. at 510 ("The good faith attending the execution of the note in the case at

16   bar is manifest from the record."). Whatever the scope of a "sham exception," Chartis

17   has not prevented any evidence that would permit the court to conclude that the partial

18   settlement was a sham as a matter of law.

19        Chartis also lacks the evidence to prove that the partial settlement did not apply to

20   a "loss" or that it covered more than a single "occurrence" within the meaning of its

21   policy. Chartis admits that it needs discovery to prove this contention. The court also

22   finds that Queen Anne has not provided evidence that permits the court to resolve these

23   issues as a matter of law.

24   **B.    On this record, the Court Can Resolve Only a Narrow Aspect of Queen**
          **Anne's Bad Faith Claim.**
25
          Turning from Chartis's breach of its duty to defend, the court considers Queen
26
     Anne's request that the court find that Chartis acted in bad faith as a matter of law. In
27

1   one limited respect, the court must grant Queen Anne's request.  Confronted with the

2   August 24 partial settlement (of which it had ample warning), Chartis declined to assume

3   Queen Anne's defense primarily because of its bare assertion that Queen Anne's

4   promissory note was not "actual payment" of a settlement.  Chartis cited no legal

5   authority for that assertion, but the court will assume for the sake of argument that

6   Chartis relied on the same legal arguments it makes in these motions.  Washington law

7   does not permit it to do so.  Chartis was not at liberty to rely on an "equivocal

8   interpretation of case law to give *itself* the benefit of the doubt rather than its insured."

9   *Woo*, 164 P.3d at 463 (emphasis in original).  An insurer must defend if "any reasonable

10  interpretation of the facts *or the law* could result in coverage . . . ."  *Am. Best Food, Inc.*

11  *v. Alea London, Ltd.*, 229 P.3d 693, 700 (Wash. 2010) (emphasis added).

12          Moreover, where an insurer fails to defend based on a "questionable interpretation

13  of law," it acts in bad faith as a matter of law.  *Am. Best Food*, 229 P.3d at 700 ("It cannot

14  be said that the insurer did not put its own interest ahead of its insured when it denied a

15  defense based on an arguable legal interpretation of its own policy.").  Given Washington

16  authority favoring Queen Anne's position and the lack of any authority (precedential or

17  otherwise) establishing that a promissory note cannot serve as "actual payment," the

18  court must find that Chartis acted in bad faith.

19          Beyond this finding, however, the court cannot decide Queen Anne's bad faith

20  claim as a matter of law.  Queen Anne complains that Chartis did not advise it of its

21  interpretation of the policy until it was too late for Queen Anne to exhaust the retained

22  limit by the method Chartis preferred.  It also claims that Chartis acted in bad faith by

23  refusing to participate in settlement discussions.  The court cannot resolve these claims

24  without resolving factual disputes.  There are factual disputes over when Chartis first

25  notified Queen Anne of its coverage position.  There are factual disputes over whether

26  the associate counsel that Chartis provided ameliorated the impact of its wrongful refusal

27  to defend.  There are factual disputes over associate counsel's role in the settlement

1  process.  For at least these reasons, the court declines to find bad faith as a matter of law

2  except as to Chartis's failure to provide Queen Anne a defense after August 24, 2011.

3  **C.     Queen Anne May Amend Its Answer and Counterclaims.**

4        Queen Anne moves for leave to amend its answer and counterclaims to reflect its

5  position on Chartis's conduct after August 24, 2011.  Chartis acknowledges that the court

6  must extend leave to amend liberally.  Fed. R. Civ. P. 15(a)(2).  It opposes Queen Anne's

7  motion to amend solely on the ground that amendment would be futile because Queen

8  Anne did not "actually pay" a judgment or settlement.  Because the court has rejected that

9  argument, the court grants Queen Anne leave to amend.

10                                **IV. CONCLUSION**

11        For the reasons stated above, the court DENIES Chartis's motion for partial

12 summary judgment.  Dkt. # 44.  It GRANTS in part and DENIES in part Queen Anne's

13 motion for partial summary judgment, granting it solely to the extent it concludes that

14 Queen Anne breached its duty to defend beginning on August 24, 2011, and did so in bad

15 faith.  Dkt. # 50.  The court GRANTS Queen Anne's motion to amend its answer and

16 counterclaims.  Dkt. # 47.  Queen Anne shall file its amended answer and counterclaims

17 no later than April 11, 2012.

18        The court vacated the pretrial schedule pending its ruling on these motions.  Now

19 that the court has resolved the motions, the court directs the parties to meet and confer to

20 prepare a joint statement.  The joint statement shall state the parties' views on how much

21 time they need to complete discovery, whether they believe additional dispositive

22 motions are appropriate, and when they believe they will be ready for trial.  The joint

23 statement is due no later than April 20, 2012.

24        DATED this 4th day of April, 2012.

25

26 _____

27 The Honorable Richard A. Jones
   United States District Court Judge